Filed 7/25/22  P. v. Depaz CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ELMER ALFREDO DEPAZ,<br><br>Defendant and Appellant. | B309275<br><br>Los Angeles County<br>Super. Ct. No. VA150220 |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Roger Ito, Judge.  Affirmed in part, sentence vacated, and remanded with directions.

Alex Green, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and Idan Ivri, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Elmer Alfredo Depaz of numerous sex crimes against his minor daughter, and the court sentenced him to 32 years in prison. On appeal, Depaz argues the trial court erred in denying his *Batson/Wheeler* motion.[1] He also contends his case must be remanded for resentencing in accordance with Senate Bill No. 567 (2021–2022 Reg. Sess.) (SB 567), which restricts a trial court's discretion to impose an upper term sentence. We agree that the case must be remanded for resentencing. We affirm the judgment in all other respects.

**FACTUAL AND PROCEDURAL BACKGROUND**

The People charged Depaz with four counts of committing a lewd act upon a child under age 14 (Pen. Code, § 288, subd. (a); counts 1, 7, 8, 9)[2], one count of continuous sexual abuse of a child under age 14 (§ 288.5, subd. (a); count 3), two counts of sexual penetration by use of force on a child over the age of 14 (§ 289, subd. (a)(1)(C); counts 4, 6), and one count of aggravated sexual assault of a child under the age of 14 (§ 269, subd. (a)(5); count 5).

At trial, the prosecutor presented evidence showing the following. Depaz's daughter, J.D., was born in the United States. When J.D. was around two years old, her parents broke up and she moved to Mexico with her mother. About eight years later, J.D. moved back to the United States to live with Depaz and his wife.

J.D.'s mother and siblings remained in Mexico, and Depaz forbade J.D. from visiting them. However, J.D. frequently

---

[1] *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).

[2] Undesignated statutory references are to the Penal Code.

communicated with her family living in Mexico. She also visited a maternal aunt who lived in the United States.

J.D. was initially afraid to sleep on her own in Depaz's home, so Depaz agreed to sleep next to her on Friday nights. One night when J.D. was 11 years old, Depaz was lying next to her in bed and put his fingers between her labia underneath her underwear. He did this three more times over the next few years under similar circumstances.

When J.D. was 14 years old, she and Depaz had an argument. Depaz tried to hug J.D. and pull up her shirt, but she fought back. Depaz touched J.D.'s breast and put his finger between her labia. J.D. told Depaz he was not supposed to act that way because he was her father. Depaz replied that if he had wanted to hurt her, he would have done so already. J.D. was scared.

Another time, when J.D. was around 15 years old, Depaz tried to hug her from behind. J.D. dropped to the floor in an attempt to escape. Depaz held J.D. down, lifted up her shirt, and grabbed her breasts. Depaz put his mouth on one of J.D.'s breasts and inserted his finger into her vagina.

When J.D. was 16 years old, Depaz came into her room and forced her onto the floor. He pulled up her shirt, put his mouth on her breast, and inserted his finger into her vagina. J.D. started screaming and crying.

J.D. told her friends about the incident, and they convinced her to report it to the police. One of the friends accompanied J.D. to the police station, where she reported Depaz's abuse. Depaz's DNA was present on the shirt J.D. was wearing, as well as a sample taken from her breast. J.D. also had a red mark on her breast.

At the end of the prosecution's case-in-chief, the court dismissed count 5. The jury convicted Depaz of the other counts. The court sentenced him to an aggregate term of 32 years, consisting of the upper term of 16 years on count 3, the middle term of 8 years on count 4, and the middle term of 8 years on count 6. The court did not orally impose sentences on counts 1, 7, 8, and 9, but it indicated the sentences would be stayed under section 654.

Depaz timely appealed.

## DISCUSSION

### 1. *The trial court properly denied Depaz's Batson/ Wheeler motion*

Depaz contends the trial court erred by denying his *Batson/Wheeler* motion. We disagree.

#### a. *Background*

The trial court instructed the prospective jurors to fill out written questionnaires as part of voir dire. Prospective Juror No. 19 wrote in his questionnaire that he was married with three children, and he owned a Vietnamese restaurant. In response to defense counsel's subsequent questioning, Prospective Juror No. 19 said the right to remain silent "means [Depaz] doesn't have to say anything," and the juror agreed with defense counsel that Depaz could not "be forced to say anything." Defense counsel asked Prospective Juror No. 19 what factors he would consider to determine whether a person was lying. Prospective Juror No. 19 responded, "[p]robably cry or his prior history of doing any criminal prior possibly . . . ." After further questioning, he added that he would also consider "[i]f they're not making eye contact or probably being nervous" and "body language." The prosecutor did not ask Prospective Juror No. 19 any questions.

4

Prospective Juror No. 16 revealed in his questionnaire that he was employed in information technology and "work[ed] close with our corporate lawyers for ediscovery matters." He also revealed that his uncle-in-law was a police officer, his wife was a teacher and mandatory reporter, and his mother was employed by a women's shelter where she worked with sexual assault victims. The prospective juror answered "yes" as to whether there is "any reason why you cannot be a fair and impartial juror in this case." He explained: "While I personally have no bias I sometimes overhear or am involved in conversations about similar actions because of my relationship with [my] wife and mother."

Defense counsel asked Prospective Juror No. 16 to explain the burden of proof, to which he responded, "[the prosecutor] has to present a case . . . so there's no doubt in our minds that defendant is guilty or not." Defense counsel then analogized the prosecutor's burden of proof to a fuel gauge in a car. Defense counsel told the jurors that the case started with the gauge pointing at empty, and the prosecutor had to "prove the case all the way to full."

The prosecutor subsequently asked Prospective Juror No. 16 why he thought the standard was "no doubt," to which the juror responded, "It's not doubt. Reasonable doubt." He then reiterated that he understood the correct standard is beyond a reasonable doubt, rather than "not any doubt." When asked by the court what "reasonable doubt" means to him, the juror responded, "[s]o if enough of the evidence or the witness points in one direction to where you might be missing a small piece of the story or puzzle but everything else—needs to safely, reasonably make something without—there's a little room for doubt."

Prospective Juror No. 6 indicated in his questionnaire that he was an environmental engineer. In response to a question from defense counsel about what factors he would look for to determine whether a witness was lying, he responded, "[i]f his testimony lines up with other witness statements, evidence." The prospective juror said he would not consider "body language." The prosecutor did not ask Prospective Juror No. 6 any questions.

b.   *Depaz's Batson / Wheeler motion*

After using peremptory challenges to exclude five prospective jurors, the prosecutor used successive peremptory challenges to exclude Prospective Juror Nos. 19, 16, and 6. Defense counsel objected, arguing there had been a "pattern in regards to the ethnicity and the gender of the people or the prospective jurors that the People have been removing. The last two were Juror Number 6, Number 16. They're both Hispanic males. The one previous to that was 19 I believe to be an Asian male. [¶] It is the defense's position that this was done merely because of their gender. I didn't hear anything unusual from those jurors. The People didn't question those people at length in regards to elicit anything they said or anything that they wrote that would raise doubt or concern about their ability to serve in this case."

The court noted, "you have both Hispanic and Asian amongst this group, right?" Counsel replied that "yesterday there was one Hispanic male that was kicked. . . . I'm not raising an argument in regards to that because that particular prospective juror raised an issue . . . in regards to his language. [¶] But as far as today, these three prospective jurors the People never spoke to or spoke to very, very small amount, and they didn't state anything in regards to something that would be

disqualifying in this particular case. And now we're in a circumstance . . . that's I believe a prima facie case for bringing a *Wheeler* motion."

The court asked defense counsel, "[I]s this *Wheeler* motion based on exclusion of an individual based on their sex or based on their race? It has to be one or the other." Counsel responded, "I would submit on their gender. On their gender. The fact that there's males being excused."

The court then found the defense had failed to show a prima facie case of discrimination. The court explained: "Number one, in my estimation there are still male jurors in the 12 that are in the box. Number 2, in my estimation I do not see a specific pattern of exclusion based exclusively on the sex or the gender of the prospective juror. [¶] Number 3, in my estimation . . . I do not find that there is a prima facie showing based . . . on the specific gender of the prospective juror . . . there being still male jurors remaining on the panel. And out of an abundance of caution . . . I can allow [the prosecutor] to make a record. However, I am not finding prima facie for purposes of gender."

The prosecutor stated she did not have her notes in front of her related to Prospective Juror Nos. 6 and 16, and she asked for clarification as to whether Depaz's motion concerned her most recent peremptory challenge. The court said, "That was Juror Number 6. Appeared to be an Asian male to me." Defense counsel responded that he "might have moved them around." The prosecutor noted it was "very confusing." The following exchange then occurred:

> "[THE PROSECUTOR]: [A]s far as 19. It was based on his answer about you would ask a lot about crying and whether crying was an issue,

7

and he was an engineer and I believe he was the one that said something about standard of doubt.  I tend to kick engineers. [¶]

"THE COURT:  Juror number 19 and 6 are both engineer[s]. [¶]

"[THE PROSECUTOR]:  I don't remember which was which.  I believe the one I just kicked right now was an engineer. [¶]

"THE COURT:  He said he's an environmental engineer. [¶] How about juror number 16? [¶]

"[THE PROSECUTOR]:  I don't have my notes on that.  Do you have—which one is that? [¶]

"THE COURT:  Juror number 16 lived in Whittier, was an I.T.  Wife[.]  [W]orks with attorneys for e discovery. [¶]

"[THE PROSECUTOR]:  I think it was the same.  Engineer.  Nice hundred percent.  They want that gas tank full as you said.  I tend to kick people who are like computer engineer types. [¶]

"THE COURT:  Did you kick off every engineer and every I.T. person that's a male on this panel? [¶]

"[THE PROSECUTOR]: Not that I'm aware of. I do remember those two issues, those two being an issue. [¶]

"THE COURT: As I've indicated, I do not find there is a prima facie showing. There are additional males on the panel. Finally, I do not believe that males specifically without any further is in fact a cognizable class for purposes of this inquiry. So based on that, the motion's going to be denied."

c.    *Legal standard*

In *Wheeler, supra*, 22 Cal.3d 258, the California Supreme Court " 'held that the use of peremptory challenges by a prosecutor to strike prospective jurors on the basis of group membership violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16, of the California Constitution.' " (*People v. Catlin* (2001) 26 Cal.4th 81, 116.) Eight years later in *Batson, supra*, 476 U.S. 79, " 'the United States Supreme Court held that such a practice violates, inter alia, the defendant's right to equal protection of the laws under the Fourteenth Amendment to the United States Constitution.' " (*Catlin*, at p. 116.)

When a party makes a *Batson/Wheeler* motion, the trial court and counsel must follow a three-step process. " 'First, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." [Citations.] Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible

9

race-neutral justifications for the strikes. [Citations.] Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination." [Citation.]' " (*People v. Avila* (2006) 38 Cal.4th 491, 541 (*Avila*), citing *Johnson v. California* (2005) 545 U.S. 162, 168.)

d. *Depaz has not shown a prima facie case of discrimination*

The parties agree, as do we, that we must begin our analysis with a review of the trial court's first stage ruling that Depaz failed to show a prima facie case of discrimination. (See *People v. Scott* (2015) 61 Cal.4th 363, 386.)

Before doing so, however, we address Depaz's contention that the trial court misunderstood the applicable law. According to Depaz, the court erroneously believed "Hispanic men" is not a cognizable class for purposes of a *Wheeler* motion. In support, he points to the court's statement suggesting his motion could be based on either gender or race, but not both. As the Attorney General concedes, "[i]n addition to groups defined by either race *or* gender, groups lying at the intersection of race *and* gender are cognizable under *Wheeler*." (*People v. Armstrong* (2019) 6 Cal.5th 735, 768.) The court, therefore, erred to the extent it suggested Depaz's motion could not be based on the group "Hispanic men."

Nevertheless, we agree with the Attorney General that the court's apparent misunderstanding of this aspect of the law did not affect its decision. Although defense counsel initially claimed that two of the prospective jurors were Hispanic men and there was a "pattern in regards to the ethnicity and the gender of . . . the prospective jurors that the People have been removing," he subsequently clarified that his motion was based on the fact that

10

the prosecutor struck the prospective jurors "*merely* because of their gender." (Italics added.) Counsel made this clarification before the court suggested he had to choose between race and gender. It is clear, therefore, his challenge was not premised on the fact that two of the prospective jurors were Hispanic men. As a result, he has not shown the court's errant remark and apparent misunderstanding of the law affected its decision.[3]

Depaz next complains that the court erroneously stated "males specifically without any[thing] further is [not] in fact a cognizable class for purposes of this inquiry." The Attorney General again concedes, as he must, that the court misstated the law. The federal and California Constitutions prohibit the use of peremptory challenges to exclude prospective jurors because of their gender. (*People v. Williams* (2000) 78 Cal.App.4th 1118, 1125 ["Peremptory challenges may not be used to exclude male jurors solely because of a presumed group bias."]; see *People v. Crittenden* (1994) 9 Cal.4th 83, 115.)

Once again, however, we agree with the Attorney General that the court's errant remark did not affect its ruling. Despite suggesting that a *Wheeler* challenge can never be based on gender, the court clearly evaluated Depaz's motion on the merits. Indeed, the court made the errant remark only after providing several valid reasons for its finding that Depaz failed to make a prima facie case of discrimination. Given this context, it appears the court simply misspoke and intended to convey that, in this

---

[3] For the same reasons, we do not consider Depaz's arguments on appeal that the prosecutor struck two jurors because they were Hispanic men.

11

specific case, Depaz had failed to show the prosecutor struck the jurors because of their gender.

Even if the court's prima facie finding were based on the erroneous belief that men are not a cognizable class, that fact alone does not require reversal. Generally, the trial court's findings are entitled to deference, and the reviewing court must affirm if substantial evidence supports its decision. (*People v. Battle* (2021) 11 Cal.5th 749, 772 (*Battle*).) However, when the court applies the wrong standard or misstates the law, the decision is not entitled to deference and the reviewing court may conduct an independent review to determine whether the prosecutor excluded a juror on an impermissible basis. (See *id.* at pp. 772, 773, fn. 6 [performing an independent review where the court misstated the law and the record did not show whether it applied the correct standard]; see also *Avila, supra*, 38 Cal.4th at p. 554 [whether the record supports an inference of discrimination is a legal question].) Accordingly, out of an abundance of caution, we will independently review the court's finding that Depaz failed to show a prima facie case of discrimination.

When conducting an independent review, "[w]e examine the entire record before the trial court to determine whether it supports an inference of such group bias. [Citation.] Certain types of evidence are especially relevant to this inquiry, including whether the prosecutor has struck most or all of the members of the venire from an identified group, whether a party has used a disproportionate number of strikes against members of that group, whether the party has engaged prospective jurors of that group in only desultory voir dire, whether the defendant is a member of that group, and whether the victim is a member of

12

the group in which the majority of the remaining jurors belong. [Citation.]  We may also consider nondiscriminatory reasons for the challenged strikes that are 'apparent from and "clearly established" in the record.'  [Citation.]  Yet we may do so only when these reasons 'necessarily dispel any inference of bias,' such that ' "there is no longer any suspicion . . . of discrimination in those strikes." '  [Citation.]"  (*Battle, supra*, 11 Cal.5th at p. 773.)

Here, it is undisputed that Depaz and Prospective Juror Nos. 6, 16, and 19 are men.  Depaz, however, does not contend that the prosecutor used her peremptory challenges to strike most or all men from the venire; nor does he argue the majority of the remaining jurors were women.  Moreover, because the record does not disclose the total number of men in the venire or the jury panel, it is impossible to determine whether the prosecutor's use of strikes against men was disproportionate to their overall representation.  (See *People v. Johnson* (2019) 8 Cal.5th 475, 507 (*Johnson*) [comparing the proportionate number of strikes used against members of a group to that group's proportionate representation in the venire and jury panel]; *People v. Garcia* (2011) 52 Cal.4th 706, 748 (*Garcia*) [same].)

Even if we were to assume the venire and panel were split evenly between men and woman,[4] Depaz still has not shown the prosecutor used a disproportionate number of strikes against men.  Over the course of the entire voir dire, the prosecutor exercised peremptory challenges against ten prospective jurors.

---

[4]     Such an assumption is not well taken.  In *People v. Bonilla* (2007) 41 Cal.4th 313 (*Bonilla*), for example, the jury pool consisted of only 38 percent women.  (*Id*. at p. 345.)

13

(See *Johnson*, *supra*, 8 Cal.5th at p. 507 ["strikes made after the *Batson/Wheeler* challenge are considered in assessing discriminatory intent"]; *People v. Reed* (2018) 4 Cal.5th 989, 1000.) The record shows five of those prospective jurors were men (Prospective Juror Nos. 6, 7, 10, 16, and 19) and two were women (Prospective Juror Nos. 4 and 28). The record does not reveal the gender of the remaining three prospective jurors (Prospective Juror Nos. 13, 22, and 32). Accordingly, the most we can say is that the prosecutor used half of her peremptory challenges against men, which is consistent with an evenly split venire and panel.

The record also clearly establishes gender-neutral reasons to use peremptory challenges against Prospective Juror Nos. 6, 16, and 19, which further dispels any inference of discrimination. Prospective Juror No. 19, for example, expressed a belief that witnesses who cry or are nervous are lying. Given J.D. was relatively young and the victim of sex crimes by her father, it would have been reasonable to expect her to be nervous and emotional on the stand. A reasonable prosecutor, therefore, would have been concerned that Prospective Juror No. 19 would discount J.D.'s testimony based on her demeanor, which provides a valid gender-neutral reason to exclude him.

The record similarly shows a gender-neutral reason to challenge Prospective Juror No. 6. The prospective juror said that in deciding if a witness's testimony is true, he would focus on whether the "testimony lines up with other witness statements, evidence." The prosecution's case, however, was based almost entirely on J.D.'s testimony; there were no third-party witnesses and, with the exception of some physical evidence related to a single incident, no corroborating evidence. Given Prospective

14

Juror No. 6's comments, a reasonable prosecutor would have been concerned that he would think J.D.'s testimony alone was not sufficient to convict Depaz. This was a valid gender-neutral reason to exclude him.

The record also shows a gender-neutral reason to challenge Prospective Juror No. 16. In response to a question from defense counsel, the prospective juror claimed the prosecutor had to prove her case "so there's *no doubt* in our minds that defendant is guilty or not." (Italics added.) Prospective Juror No. 16's belief that the prosecutor had to prove her case beyond all doubt provided a compelling reason to exclude him. (See *People v. Zaragoza* (2016) 1 Cal.5th 21, 43 [a juror's statement that a capital case requires proof " 'without doubt' that 'the defendant was 100% guilty' " provided a compelling nondiscriminatory justification for excusing the juror].) Although the prospective juror subsequently claimed he understood the proper standard is "beyond a reasonable doubt," a prosecutor is not required to accept a juror's answer at face value if contradicted by his other statements. (*Battle, supra*, 11 Cal.5th at p. 779.)

We acknowledge that the prosecutor did not ask any questions of Prospective Juror Nos. 19 and 6. That fact, however, is of limited significance given the jurors filled out questionnaires, and the prosecutor was able to observe their responses and demeanors during individual questioning by the court and defense counsel. (See *People v. Clark* (2011) 52 Cal.4th 856, 906–907 [the fact that the prosecutor asked a juror only a few questions was insignificant because the prosecutor had access to juror questionnaires and observed other questioning].) The prosecutor, moreover, did not question five of the 10 jurors whom she used peremptory challenges against. Under these

15

circumstances, her failure to question Prospective Juror Nos. 19 and 6 is not particularly probative.

After examining the entire record of voir dire, we conclude Depaz's showing is insufficient to give rise to an inference that discriminatory intent against men motivated the prosecutor to use peremptory challenges against Prospective Juror Nos. 6, 16, and 19. The trial court, therefore, properly denied his motion on that basis.

e.      *Depaz has not shown the prosecutor's stated reasons for excusing the prospective jurors were not genuine*

Even if the record showed a prima facie case of discrimination, we would conclude the court properly denied Depaz's motion at the third step. Although the trial court did not explicitly find the prosecutor's stated justifications were genuine, the parties seem to agree it did so implicitly. Accordingly, we will do the same. (See *People v. Chism* (2014) 58 Cal.4th 1266, 1313 (*Chism*) [finding a trial court implicitly accepted the prosecutor's stated justification for exercising a peremptory challenge].)

At this third step, we "presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses." (*People v. Burgener* (2003) 29 Cal.4th 833, 864.) "We review the decision of the trial court under the substantial evidence standard, according deference to the trial court's ruling when the court has made a sincere and reasoned effort to evaluate each of the stated reasons for a challenge to a particular juror. [Citations.] '[T]he trial court is not required to make specific or detailed comments for the record to justify every instance in which a prosecutor's race-neutral reason for exercising a peremptory challenge is being

16

accepted by the court as genuine.' " (*People v. Hamilton* (2009) 45 Cal.4th 863, 900–901.)

The parties agree that the prosecutor purported to challenge Prospective Juror Nos. 6 and 16 based on her belief that engineers and "people who are like computer engineer types" demand a higher level of certainty before they will convict. The jurors' questionnaires indicate Prospective Juror No. 6 was an environmental engineer, and Juror No. 16 worked in information technology where he assisted attorneys with e-discovery matters.[5] As Depaz concedes, a prosecutor may exercise a peremptory challenge based on a prospective juror's occupation. (See *People v. Rushing* (2011) 197 Cal.App.4th 801, 811 ["Occupation can be a permissible, nondiscriminatory reason for exercising a peremptory challenge."].) Moreover, the prosecutor's expressed reservation about having engineers and "computer engineer types" on the jury had " ' " 'some basis in accepted trial strategy' " ' [citation] insofar as it stemmed from a concern about the general attitudes and philosophies persons in that profession might harbor." (*People v. Mai* (2013) 57 Cal.4th 986, 1053.)

Depaz contends it was unreasonable for the prosecutor to believe the prospective jurors would demand a higher level of certainty because of their occupations, especially in light of the fact that she did not ask Prospective Juror No. 6 questions to confirm or dispel the generalization. A prosecutor, however, need not provide an objectively reasonable ground for challenging a prospective juror. (*Chism, supra,* 58 Cal.4th at p. 1317.)

---

[5] Depaz does not challenge the prosecutor's characterization of Prospective Juror No. 16 as a "computer engineer type[ ]" person.

17

Regardless, we do not agree that a belief that engineers demand a higher level of certainty is so unreasonable that it suggests the prosecutor's stated reasons for using the peremptory challenges were pretextual. Nor do we think questioning Prospective Juror No. 6 about the issue was likely to have yielded meaningful information.

Depaz further insists the prosecutor's stated reason for excusing Prospective Juror No. 16 could not have been genuine because he was otherwise an ideal juror for the prosecution. In support, Depaz points out that the prospective juror had a connection to law enforcement, and his mother and wife had worked with victims of sex crimes. The prospective juror's connection to law enforcement, however, was tenuous at best: he said that his wife's uncle was a police officer. It is also not self-evident that the prospective juror's wife's and mother's work with sex crime victims necessarily made him an ideal juror for the prosecution. It is possible, for example, that he would have been skeptical of the prosecutor's case if the circumstances did not resemble other crimes he had heard about from his wife and mother. The prosecutor, therefore, reasonably could have viewed him as a "wild card." (See *Bonilla, supra*, 41 Cal.4th at p. 348; *Garcia, supra*, 52 Cal.4th at p. 749.) In any event, prosecutors "don't have to accept a prospective juror simply because the juror may be pro-prosecution in some respects." (*Battle, supra*, 11 Cal.5th at p. 779.)

As to Prospective Juror No. 19, the prosecutor explained that she used a peremptory challenge to exclude him because of "his answer about . . . crying and whether crying was an

18

issue . . . ."[6] Depaz contends this reason was too "trivial" to "remove the taint of discriminatory intent," especially because the juror offered other factors he would consider when determining credibility. We are not persuaded. As discussed above, Prospective Juror No. 19's bizarre claim that a person who cries is lying was significant given the nature of the prosecution's case. Regardless, a prosecutor may excuse a juror for a trivial reason, so long as it is genuine and non-discriminatory. (*People v. Arias* (1996) 13 Cal.4th 92, 137; see *People v. Lenix* (2008) 44 Cal.4th 602, 613 [a "prospective juror may be excused based upon facial expressions, gestures, hunches, and . . . for arbitrary or idiosyncratic reasons"].) On the record before us, there is no reason to doubt the prosecutor's sincerity.

We also reject Depaz's contention that the trial court failed to make a " 'sincere and reasoned effort' " to evaluate the prosecutor's justifications because it did not correct her erroneous claim that Juror No. 19 was an engineer who she believed "was the one that said something about the standard of doubt." The court responded to the prosecutor's comments by stating, "Juror Number 19 and six are both engineer[s]." Although the reporter's transcript indicates this was a declarative statement, it appears the court intended it to be a question. Indeed, after the court made the remark, the prosecutor admitted she could not "remember which [juror] was which. I believe the one I just

---

[6] The prosecutor initially stated Prospective Juror No. 19 was an engineer who she believed "was the one that said something about the standard of doubt." She subsequently corrected herself, noting the juror she "just kicked right now [Prospective Juror No. 6]" was the engineer. She also admitted having trouble remembering which juror was which.

kicked right now [Prospective Juror No. 6] was an engineer." The court then correctly noted that Prospective Juror No. 6 said he was an environmental engineer, and it asked the prosecutor whether she "kick[ed] off every engineer and every I.T. person that's male on this panel."  It is apparent from this exchange that the trial court made a sincere and reasoned effort to evaluate the prosecutor's stated justifications.  Depaz has not shown the court erred in finding the prosecutor used her peremptory challenges in a constitutional manner.

## 2. *Depaz's case must be remanded for resentencing*

At the time the trial court sentenced Depaz, section 1170 provided that "[w]hen a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the choice of the appropriate term shall rest within the sound discretion of the court."  (Former § 1170, subd. (b).)  Under this provision, the trial court was free to impose an upper term sentence based on any aggravating circumstances it deemed significant, so long as they were reasonably related to the decision being made. (*People v. Moberly* (2009) 176 Cal.App.4th 1191, 1196.) "An aggravating circumstance is a fact that makes the offense 'distinctively worse than the ordinary.' " (*People v. Black* (2007) 41 Cal.4th 799, 817 (*Black*).)  The California Rules of Court provide a non-exhaustive list of aggravating circumstances, including that the victim was particularly vulnerable, the defendant took advantage of a position of trust or confidence to commit the offense, and the crime involved acts disclosing a high degree of cruelty, viciousness, or callousness.  (Cal. Rules of Court, rule 4.421.)

The trial court exercised its discretion under section 1170 in selecting the upper term of 16 years on count 3 (§ 288.5,

subd. (a) [continuous sexual abuse of a child under age 14]). The court explained that it selected that term because "the victim was particularly vulnerable. The defendant took advantage of a position of trust. . . . [¶] . . . For years this young girl was abused by her natural father and he isolated her from the family in Mexico that could have provided some degree of support or could have provided some degree of clarification as to where she should go or what she should do. And in my estimation, this isolation was part and parcel of that abuse."[7]

While Depaz's appeal was pending, the Legislature passed SB 567, which restricts a trial court's discretion to impose an upper term sentence. Effective January 1, 2022, "[t]he court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (§ 1170, subd. (b)(2).)

The parties agree, as do we, that because Depaz's case was not yet final when SB 567 went into effect, he is entitled to the retroactive benefit of the ameliorative legislation. (See *In re Estrada* (1965) 63 Cal.2d 740, 744–745; *People v. Flores* (2022) 73 Cal.App.5th 1032, 1039; *People v. Garcia* (2022) 76 Cal.App.5th 887, 890–891.) The parties disagree, however,

_____

[7]    The Attorney General contends the court likely imposed the upper term also because the crime involved acts "disclosing a high degree of cruelty, viciousness, or callousness." (See Cal. Rules of Court, rule 4.421(a)(1).) The court, however, never explicitly mentioned this aggravating circumstance.

as to the proper disposition. Depaz insists that, because the trial court relied on aggravating circumstances not stipulated to or found true by the jury when imposing the upper term on count 3, we must remand the case for resentencing. The Attorney General insists remand is not necessary because the trial court's failure to apply the new law is harmless.

As the Attorney General seems to recognize, the retroactive application of SB 567 to Depaz's case raises both constitutional and statutory concerns. We consider the constitutional issue first, which requires a brief discussion of the history of section 1170.

The original version of section 1170 required a trial court to impose the middle term unless the court found circumstances in aggravation or mitigation of the crime. (Stats. 1976, ch. 1139, § 273.) In *Cunningham v. California* (2007) 549 U.S. 270 (*Cunningham*), the United States Supreme Court held this provision "violated a defendant's [Sixth Amendment] right to a jury trial to the extent it permitted a judge to impose an upper term sentence in the absence of an aggravating factor established by the jury's verdict, the defendant's admissions, or the defendant's prior conviction." (*People v. Towne* (2008) 44 Cal.4th 63, 74.)

In response to *Cunningham*, the Legislature amended section 1170 to provide that "[w]hen a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the choice of the appropriate term shall rest within the sound discretion of the court." (Stats. 2007, ch. 3, § 2.) By allowing trial courts to exercise discretion within a statutory range, rather than mandating the middle term absent aggravating or mitigating circumstances, the amended statute avoided

the issues the United States Supreme Court identified in *Cunningham*. (*People v. Sandoval* (2007) 41 Cal.4th 825, 843–844 (*Sandoval*).) The trial court sentenced Depaz under this version of section 1170.

The current version of section 1170, as amended by SB 567, once again implicates *Cunningham* because it precludes a trial court from selecting the upper term unless there are aggravating circumstances. (§ 1170, subd. (b).) Here, the trial court imposed the upper term on count 3 based on aggravating circumstances that were not established by the jury's verdict, Depaz's admissions, or his prior convictions. The sentence, therefore, runs afoul of *Cunningham*, and we must remand for resentencing unless the error is harmless.

In *Sandoval*, the California Supreme Court held that *Cunningham* error is harmless if the reviewing court determines, beyond a reasonable doubt, that the jury would have found true at least one aggravating circumstance, regardless of whether the trial court relied on additional aggravating circumstances. (*Sandoval, supra*, 41 Cal.4th at pp. 838–839.) "[S]o long as a defendant is *eligible* for the upper term by virtue of facts that have been established consistently with Sixth Amendment principles, the federal Constitution permits the trial court to rely upon any number of aggravating circumstances in exercising its discretion to select the appropriate term by balancing aggravating and mitigating circumstances, regardless of whether the facts underlying those circumstances have been found to be true by a jury." (*Black, supra*, 41 Cal.4th at p. 813.)

Our Supreme Court, however, has cautioned that it can be "problematic" for a reviewing court to determine whether a jury would have found true an aggravating circumstance had it been

23

submitted to the jury. (*People v. Boyce* (2014) 59 Cal.4th 672, 728.) The reviewing court, for example, "cannot assume that the record reflects all of the evidence that would have been presented to the jury, or that the defendant had the same incentive and opportunity at a sentencing hearing to contest the aggravating circumstance." (*Ibid*.) In addition, "to the extent a potential aggravating circumstance at issue in a particular case rests on a somewhat vague or subjective standard, it may be difficult for a reviewing court to conclude with confidence that, had the issue been submitted to the jury, the jury would have assessed the facts in the same manner as did the trial court." (*Sandoval, supra*, 41 Cal.4th at p. 840.) Further, "[m]any of the aggravating circumstances described in the rules require an imprecise quantitative or comparative evaluation of the facts. For example, aggravating circumstances set forth in the sentencing rules call for a determination as to whether '[t]he victim was *particularly* vulnerable,' whether the crime 'involved a[ ] . . . taking or damage of *great* monetary value,' or whether the 'quantity of contraband' involved was '*large*' [citation]. In addition, the trial court may consider aggravating circumstances not set forth in rules or statutes. . . . Aggravating circumstances considered by the trial court that are not set out in the rules are not subject to clear standards, and often entail a subjective assessment of the circumstances rather than a straightforward finding of facts." (*Ibid*.)

Here, the trial court cited two aggravating circumstances in support of its decision to impose an upper term sentence on count 3: (1) J.D. was particularly vulnerable and (2) Depaz used a position of trust to commit the offense. With respect to the first circumstance—that J.D. was particularly vulnerable—we are not

convinced beyond a reasonable doubt that the jury would have found it true. As the Supreme Court has cautioned, determining whether a victim was particularly vulnerable requires an imprecise quantitative or comparative evaluation of the facts. (*Sandoval, supra*, 41 Cal.4th at p. 840.) This makes it difficult to conclude with confidence that the jury would have assessed the facts in the same manner as did the trial court. (*Ibid*.)

The evidence on the issue is also not as one-sided and overwhelming as the Attorney General suggests. According to the Attorney General, there is no doubt the jury would have concluded J.D. was particularly vulnerable given the evidence shows she was an immigrant child, had no support network in the United States aside from Depaz, and was isolated from her mother in Mexico. The Attorney General, however, overlooks evidence showing J.D. had a good relationship with Depaz's wife, visited a maternal aunt who lived in the area, frequently communicated with her mother and other family members in Mexico, and formed meaningful friendships with her classmates. We also cannot assume the record reflects all the evidence that would have been presented had the issue been before the jury. Accordingly, we cannot say beyond a reasonable doubt that the jury would have found J.D. was particularly vulnerable had the issue been submitted to it.

We are, however, confident the jury would have found that Depaz took advantage of a position of trust to commit the offense. Unlike the question of whether J.D. was particularly vulnerable, determining whether Depaz used a position of trust does not require an imprecise quantitative or comparative evaluation of the facts. The undisputed evidence, moreover, shows Depaz is J.D.'s biological father and that she was under his care when

he continuously sexually abused her. Further, J.D. testified that Depaz committed the abuse while lying in her bed at night after she expressed a fear of sleeping alone. The jury clearly believed this testimony in convicting Depaz of continuous sexual abuse, and Depaz does not contend he could have presented evidence or otherwise developed the record in such a way as to show he did not take advantage of a position of trust. On this record, it is beyond a reasonable doubt that the jury would have found Depaz used a position of trust as J.D.'s father to commit the offense. (See *People v. Jones* (1992) 10 Cal.App.4th 1566, 1577 ["the fact that defendant was the children's biological father . . . clearly supports the finding that defendant used a position of trust and confidence, that of a legal parent, to commit the offense"]; *People v. Clark* (1992) 12 Cal.App.4th 663, 666 [a stepfather who was entrusted with caring for the victim was placed in a position of trust and confidence regarding the child].) Accordingly, any *Cunningham* error is harmless.

The fact that Depaz's sentence passes constitutional muster, however, does not end our inquiry. Instead, we must also decide whether the trial court complied with the statutory requirements of the amended version of section 1170.

As the parties seem to agree, under the current version of section 1170, a trial court may not rely on its own factual findings at sentencing to impose an upper term sentence, with the exception of findings related to the defendant's criminal record.[8] The trial court in this case relied on two aggravating

---

[8] Section 1170 does not explicitly forbid a trial court from relying on its own factual findings in addition to those found true by the trier of fact or stipulated to by the defendant. However, section 1170, subdivision (b)(3) states "the court may consider

circumstances that were not found true at trial, stipulated to by Depaz, or related to Depaz's criminal record. Although the record shows the jury would have found true one of those circumstances—that Depaz used a position of trust to commit the offense—it is not clear that it would have found true the other—that J.D. was particularly vulnerable. By relying on the latter circumstance to impose the upper term on count 3, the court failed to comply with the current version of section 1170.

When a trial court relies on an improper factor at sentencing, the reviewing court must determine whether it is " ' "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of

---

the defendant's prior convictions in determining sentencing . . . without submitting the prior convictions to a jury," which implies the court may not consider other factors that were not submitted to the jury. (See *In re J.W.* (2002) 29 Cal.4th 200, 209 ["the expression of one thing in a statute ordinarily implies the exclusion of other things"].) This interpretation is consistent with the legislative history of SB 567. Numerous legislative committee reports and analyses of SB 567, for example, state the bill requires the aggravating circumstances relied on by the court at sentencing be found true by the trier of fact or admitted by the defendant. (See, e.g., Sen. Com. on Public Safety, Analysis of Sen. Bill No. 567 (2021–2022 Reg. Sess.) Mar. 9, 2021, p. 1; Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 567 (2021–2022 Reg. Sess.) as amended May 20, 2021, p. 1; Assem. Com. on Appropriations, Rep. on Sen. Bill No. 567 (2021–2022 Reg. Sess.) as amended July 1, 2021, p. 1; Assem. Com. on Public Safety, Rep. on Sen. Bill No. 567 (2021–2022 Reg. Sess.) as amended May 20, 2021, p. 1.)

the error." ' "[9] (*People v. Avalos* (1984) 37 Cal.3d 216, 233 (*Avalos*), quoting *People v. Watson* (1956) 46 Cal.2d 818, 836; see *People v. Price* (1991) 1 Cal.4th 324, 492 ["When a trial court has given both proper and improper reasons for a sentence choice, a reviewing court will set aside the sentence only if it is reasonably probable that the trial court would have chosen a lesser sentence had it known that some of its reasons were improper."].) Under this standard, the reviewing court must remand for resentencing if it "cannot determine whether the improper factor was determinative for the sentencing court." (*Avalos,* at p. 233.)

Here, it is not sufficiently clear that the trial court would have selected the upper term on count 3 had it not relied on its finding that J.D. was particularly vulnerable. Indeed, the court imposed the middle term on counts 4 and 6, despite the fact that Depaz committed those offenses under similar circumstances. Because we cannot determine whether J.D.'s vulnerability was determinative for the court, we must remand the case

---

[9] We disagree with *People v. Flores* (2022) 75 Cal.App.5th 495 to the extent it suggests the *Cunningham* harmless error standard applies to statutory violations of section 1170. When the California Supreme Court articulated the *Cunningham* harmless error standard, section 1170 allowed a trial court to impose an upper term sentence based on its own factual findings at sentencing. (*Sandoval, supra,* 41 Cal.4th at p. 836.) As a result, the Supreme Court was concerned only with federal constitutional violations. The current version of section 1170 mandates the facts underlying most aggravating circumstances be found true by the trier of fact or stipulated to by the defendant. Therefore, when a court relies on its own factual findings at sentencing, there are potentially both federal constitutional and state statutory violations, which involve different harmless error standards.

28

for resentencing in accordance with the amended version of section 1170.

We also remind the court that, when resentencing Depaz, it must orally impose a term on each count, including those it stays under section 654. (See *People v. Alford* (2010) 180 Cal.App.4th 1463, 1466 ["when a trial court determines that section 654 applies to a particular count, the trial court must impose sentence on that count and then stay execution of that sentence"]; *People v. McGahuey* (1981) 121 Cal.App.3d 524, 530 ["[t]o be effective, a sentence must be pronounced orally on the record and in defendant's presence"].)

## DISPOSITION

We vacate Elmer Alfredo Depaz's sentence and remand the case for resentencing in accordance with section 1170, as amended by SB 567. We affirm the judgment in all other respects.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EGERTON, J.

We concur:

EDMON, P.J.                    LAVIN, J.

29